```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )    No. 4:07CR270 HEA
                               )                (FRB)
JUANELL CARTER,                )
                               )
            Defendant.         )

## MEMORANDUM,
## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). The defendant filed a Motion To Suppress Physical Evidence (Docket No. 33), to which the government responded (Docket No. 35). Testimony and evidence was adduced on the motion at a hearing before the undersigned. Following the hearing the defendant requested that a written transcript of the hearing be prepared. Following the filing of the written transcript both the defendant and the government filed supplemental memoranda in support of their respective positions on the issues raised in the defendant's motion. The court has relied on both the written transcript and the digital audio recording of the proceedings in making findings of fact.

## Findings of Fact

Shortly before midnight on February 13, 2007, Officer Matthew Tesreau of the St. Louis, Missouri Metropolitan Police Department was on routine patrol in the Third Police District in the City of St. Louis. Officer Tesreau had been a St. Louis police officer for one year and had patrolled in the Third District for that entire period and was familiar with the area.

Officer Tesreau was driving eastward on Arsenal Street and stopped at a stop sign at the intersection of Arsenal and Minnesota. Officer Tesreau was in uniform and driving a marked police vehicle. A gray colored Grand Prix automobile was stopped at the intersection going westbound on Arsenal. The driver of the Grand Prix drove part way into the intersection. As he did so he and Officer Tesreau made eye contact. The Grand Prix then turned left onto Minnesota driving south. A red Monte Carlo automobile which had been behind the Grand Prix on Arsenal then drove through the stop sign and turned onto Minnesota following the Grand Prix. The two cars drove slowly, about five to ten miles an hour, with the Monte Carlo following closely behind the Grand Prix.

Officer Tesreau turned right onto Minnesota and followed the two cars. At the next intersection the Grand Prix made a right turn onto Gravois Avenue and the Monte Carlo followed. The Grand Prix drove a short distance and then made a right turn onto Juniata Street going west. The Monte Carlo followed. After driving about

one or two blocks west on Juniata the Grand Prix turned right onto Compton Avenue, going north. Again the Monte Carlo followed. Officer Tesreau continued to follow both vehicles.

The two vehicles then drove to the intersection of Compton and Arsenal. An electric traffic signal was located at that intersection. When the vehicles approached the intersection the green traffic signal for northbound traffic on Compton Avenue changed to yellow and then to red. As the light was yellow the Grand Prix drove through the intersection continuing north on Compton. The Monte Carlo stopped at the red light, with Officer Tesreau behind.

Officer Tesreau was able to keep the Grand Prix in sight and noticed that it traveled about three-fourths of the block north on Compton and then pulled to the curb on the east side of the street. The lights of the vehicle were turned off. Officer Tesreau did not see anyone exit the vehicle after it pulled to the curb.

The traffic light at Arsenal turned green for traffic on Compton and the Monte Carlo then continued traveling north on Compton. Officer Tesreau followed but allowed the Monte Carlo to get some distance ahead of his vehicle. When the Monte Carlo reached the area where the Grand Prix was parked it stopped momentarily and then continued north on Compton. Officer Tesreau then drove up closer to the Grand Prix. He could see that the

motor of the Grand Prix was still running as there was exhaust coming from the tail pipe of the vehicle. Officer Tesreau ran a check on the license plate on the Grand Prix and learned that it was registered to PBC Holding Company, a car rental company.

All of these things caused Officer Tesreau to be suspicious that the occupants of the two vehicles might be engaged in criminal activity. The area in which these events were occurring was a high crime area known for drug trafficking and gang activity. Officer Tesreau had made arrests for drug and gun violations in the past in this vicinity. Additionally, he knew that rental cars, and particularly cars rented from PBC Holding Company had been used in drug trafficking activity in the past. He also believed that the manner and method in which the cars were being operated were unusual.

Officer Tesreau then pulled his police vehicle nearer to the Grand Prix. He activated the emergency flashing lights on the top of his police car and shined a spotlight onto the vehicle. He then got out of his police car and approached the Grand Prix from the rear on the driver's side. As he did so he could see that the driver, later identified as Juanell Carter, the defendant here, was leaning and reclining back in the driver's seat. Carter was also moving his hands to the right side of where he was sitting. Officer Tesreau ordered Carter to show his hands but he did not do so. Officer Tesreau yelled the command again in a louder voice.

Carter did not comply. Carter continued to fidget with his hands to the side. Officer Tesreau repeated the command a third time in a loud voice but Carter did not comply. Officer Tesreau then removed his firearm from his holster and held it behind his back, fearing that Carter might be arming himself. Officer Tesreau then yelled again in a loud voice for Carter to show his hands. This time Carter complied, rolling down the window of the Grand Prix and displaying his hands out the window. At about this time Officer Seth Dorsey arrived to assist Officer Tesreau. Officer Dorsey approached the Grand Prix from the rear passenger side of the vehicle.

Officer Tesreau ordered Carter to step out of the vehicle which he did. Officer Tesreau then holstered his gun. Officer Tesreau asked to see Carter's driver's license and it was produced by Carter. Officer Tesreau asked Carter for his social security number. Carter said that he did not know the number. Officer Tesreau asked if Carter was lost and Carter replied that he was not. Carter said that he was coming from his mother's home in the 4500 block of Arsenal. Officer Tesreau found the statement to be somewhat contradictory because the direction in which Carter was originally driving was toward, rather than away from, that address. Officer Tesreau asked Carter about the Monte Carlo that appeared to be driving in tandem with and following his vehicle. Carter replied that he knew nothing about the Monte Carlo.

As Officer Tesreau spoke with Carter he shined his hand held flashlight into the interior of the Grand Prix. When he did so he noticed a brown paper bag on the rear seat of the vehicle. Officer Tesreau asked Carter what was inside of the brown bag and Carter replied, "Pills." When asked what kind of pills Carter stated, "Just pills." Officer Tesreau asked if he could look inside the bag and Carter said yes. Officer Tesreau then retrieved the bag from the rear seat of the Grand Prix and looked inside the bag. He saw a plastic ziplock bag which had marked on it in black marker the number "1000." Inside the ziplock bag was a large number of empty clear gelatin capsules. Officer Tesreau knew from prior experience that capsules such as these were used to package for sale illicit drugs including cocaine, heroin and methamphetamine. Officer Tesreau told Carter that he believed the capsules were being used in drug activity and he advised Carter of his constitutional rights by reading them from a card. Carter then said to Officer Tesreau, "This is a rental car. That ain't my pills. I don't know where those pills came from."

Officer Tesreau then placed handcuffs on Carter and told him that he was being detained for further investigation. He placed Carter into the back seat of Officer Shelton's police car. Officer Tesreau then ran a computer check and learned that Carter was on parole for convictions for manslaughter and assault first degree and was listed in police records as a crips gang member.

Officer Tesreau contacted the dispatcher and asked that officers in the area be notified to look for a red Monte Carlo in the area and, if seen, to stop the vehicle for investigation.

Officer Tesreau then again spoke with Carter and asked him the same series of questions as he had asked earlier and Carter gave the same answers. Officer Tesreau then told Carter he was under arrest for possession of drug paraphernalia. Carter was again advised of his constitutional rights and Carter said that he understood those rights. He again stated that the capsules found in the car did not belong to him.

Officer Dorsey then conducted a search of the Grand Prix. He found a semiautomatic pistol lodged between the driver's seat and the center console of the vehicle. He removed the pistol and found it to be loaded with one round in the chamber and eighteen rounds in the magazine. The firearm was seized. A drug canine was called to the scene. When allowed to sniff the area of the Grand Prix the dog alerted to the presence of the odor of drugs, however no drugs were found in the vehicle. The vehicle was seized for possible forfeiture.

As the officers were at the scene completing their investigation the red Monte Carlo drove by the location and one of the officers was dispatched to stop the vehicle. After the Monte Carlo was stopped it was learned that there were outstanding warrants for the arrest of the female who was driving the vehicle

and she was taken into custody.  Both Carter and the female were transported to the police station.

At the station Officer Shelton began the process of booking Carter for the offenses for which he had been arrested.  As a part of that process he conducted a search of Carter's person.  Carter was wearing multiple layers of clothing and as Officer Shelton was attempting to search the various pieces of clothing he saw Carter drop something from his hand onto the floor.  Officer Shelton saw the item to be a plastic baggie.  He picked the bag up and saw that it contained numerous gelatin capsules containing a brown powder substance.  The capsules were identical to those found in the Grand Prix.  It was later determined that there were 67 capsules in the baggie, and that the powder in the capsule was heroin.

During the booking process Carter also dropped another plastic baggie containing 17 capsules of heroin. $1,050.00 in currency was found in Carter's pants pocket and was seized.

The female driver of the vehicle was interviewed at the station and stated that she had been following Carter and was supposed to obtain a capsule of heroin from him.  She stated that Carter called her on the telephone as they were driving and told her that the police were following them.  She said that when he pulled his vehicle to the curb on Compton he told her not to stop and to keep going.

## Discussion

In his Motion To Suppress Physical Evidence the defendant makes the following assertions as grounds to suppress the items of physical evidence seized by the officers in the course of events described above:

1. That the search and seizure were made without warrant and without other lawful authority or justification.

2. That the arrest and detention, if any, was illegal, unconstitutional and unreasonable, in that at the time the claimed arrest was made or detention no offense was being committed in the officers' presence, the arrest was made without probable cause, the detention was without legal justification, the officers had no warrant for arrest, and/or the arrest came after the search and seizure.

3. The search was general in nature and exceeded and went beyond the area of arrest, and beyond the justification.

4. The search and/or seizure was made without probable cause, and there was no exigent circumstances justifying or authorizing the search and/or seizure.

5. The search and seizure was made for other than the fruits of the offense for which the arrest was made, and not for the officers' protection.

6. The officers were not making a reasonable and bona fide

inventory or inspection but were making a warrantless search and seizure.

7. Any claimed consent was not voluntarily and/or understandingly and knowingly given, or was by a person not legally authorized to consent thereto.

8. The items were not in the plain view of the officers nor at a place the officers had a lawful right to be; the criminal nature thereof was not immediately apparent; and the observation thereof was not inadvertent.

9. The items seized were testamentary in nature.

10. The search and/or seizure were the fruits of a previous illegal, unconstitutional, and unreasonable search, arrest, detention, intrusion, and/or statement.

11. That among the items so seized were:
    a) Heroin
    b) Semi-automatic pistol

12. That the search and/or seizure violated the defendant's rights granted him by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

In his post hearing memorandum the defendant addresses only the issue of whether and when his person was seized within the meaning of the Fourth Amendment and whether such seizure was supported by a reasonable suspicion on the part of Officer Tesreau that criminal activity was afoot.

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons." Terry v. Ohio 392 U.S. 1, 19n 16 (1968). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). However, circumstances indicative of a seizure "'would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Angell, 11 F.3d 806, 809 (8th Cir. 1993, cert. denied, 512 U.S. 1239 (1994) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

In the first instance it should be noted that Officer Tesreau did not "stop" the defendant's automobile, that is, he did not, through the use of any force or direction, compel or direct the defendant to curb his vehicle as it was being driven. Rather, Officer Tesreau approached the vehicle after the defendant had parked the car on the street of his own volition. The fact that Officer Tesreau turned on the flashing lights of his police car and shined a light on the vehicle did not serve to turn the encounter into a Fourth Amendment seizure. <u>United States v. Dockter</u>, 58 F.2d 1284, 1287 (8th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1122 (1996).

Law enforcement officers may detain an individual for a brief period of time if they have reasonable suspicion that criminal activity is afoot. <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). In order to detain a person in such circumstances an officer must have "a particularized and objective basis" for suspecting criminal activity. <u>United States v. Jacobsen</u>, 391 F.3d 904, 906 (8th Cir. 2004). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." <u>United States v. Maltais</u>, 403 F.3d 550, 554 (8th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1177 (2006). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal,

objective justification for an investigatory [detention]." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). In forming a basis for suspicion officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003)(quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). A number of factors, innocent in and of themselves, may give rise to a reasonable suspicion in the eyes of a trained law enforcement officer. United States v. Barker, 437 F.3d 787, 790 (8th Cir. 2006).

The defendant was detained in these circumstances when Officer Tesreau ordered in a loud voice for the defendant to show his hands and step out of the vehicle. United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005). At the time Officer Tesreau ordered the defendant out of the vehicle he was aware of the following facts: He saw two cars apparently driving together in a very slow manner; it was late at night in an area known for drug trafficking and gang activity; the cars were driving in a circuitous route which returned them to the direction from which they had come; that the car was registered to PBC Holding, a rental company, and that rental cars, and cars from PBC Holding in particular, had been used in drug trafficking activity in the past; that the driver of the car was leaning back in the seat and moving

his hands about at his right side; and the driver refused to respond to several commands by Officer Tesreau to show his hands. Many of these same factors have in the past been held to be factors in reasonable suspicion equations. United States v. Walker, 494 F.3d 688, 692 (8th Cir. 2007)(Unusual driving behavior); United States v. Owens, 101 F.3d 559, 561-62 (8th Cir. 1996), cert. denied, 520 U.S. 1220 (1997)(Cars driving in tandem); United States v. Atlas, 94 F.3d 447, 450-51 (8th Cir. 1996), cert. denied, 520 U.S. 1130 (1997)(High crime area known for gang activity); United States v. Bell, 480 F.3d 860, 864 (8th Cir. 2007)(Further hand movements by driver toward vehicle console); United States v. Arvizu, 534 U.S. 266, 273 (2002)(Time of day or night, location of suspect parties, and parties' behavior when they become aware of officer's presence). The totality of these circumstances gave Officer Tesreau reasonable grounds for a brief detention of the defendant.

During an investigative detention of a person driving an automobile, an officer may order the driver to step out of the vehicle Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). During an investigative detention an officer may take steps to determine the suspect's identity and to maintain the status quo while obtaining information sufficient to dispel or confirm his suspicion of criminal behavior. Adams v. Williams, 407 U.S. 143, 145–46 (1972); Florida v. Royer, 460 U.S. 491, 500 (1983).

After the defendant got out of the vehicle Officer Tesreau asked the defendant for his driver's license identification, which the defendant produced. Officer Tesreau then asked the defendant several other questions, including whether he was lost, from where he had been coming, and about the car which appeared to have been following his. Some of the answers the defendant gave did not appear to Officer Tesreau to be consistent with what had been observed. It is reasonable to prolong the detention when a defendant gives implausible or inconsistent answers. United States v. Hernandez, 418 F.3d 1206, 1210-11 (8th Cir. 2005).

As he spoke with the defendant Officer Tesreau shined his flashlight into the rear seat of the vehicle and saw a brown paper bag on the seat. "The act of looking through a car window is not a search for Fourth Amendment purposes . . . ." United States v. Brooks, ___ F.3d ___, No. 07-1473 (8th Cir., Dec. 5, 2007). This is so even if done with the assistance of a flashlight to illuminate the area. United States v. Garner, 907 F.2d 60, 62 n.2 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991).

Officer Tesreau then asked what was in the bag and the defendant replied, "Pills". Officer Tesreau then asked what kind of pills and the defendant replied, "Just pills." Officer Tesreau then asked if he could look in the bag and the defendant replied that he could. Officer Tesreau then retrieved the bag and looked

into it and saw a plastic bag containing numerous empty clear gelatin capsules. The bag had the number "1000" written on it in black marker. Officer Tesreau knew from experience and training that such capsules were used to package illicit drugs for sale. The search of the bag was lawful because made with the voluntary consent of the defendant. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). The defendant was not under arrest or physically restrained in any way at the time he gave consent. There is no evidence that any threats or promises were made to the defendant to induce him to give consent. Although Officer Tesreau had earlier drawn his weapon it had since been reholstered and was not displayed to or at the defendant. The consent was given within a short period after the encounter began. There is no evidence that the defendant was under the influence of drugs or alcohol or otherwise impaired when the consent was given. Further, the defendant has had past experience in the criminal justice system. The totality of these circumstances demonstrate that the defendant's consent was voluntary. <u>United States v. Chaidez</u>, 906 F.2d 377, 380-81 (8th Cir. 1990).

After discovering the capsules Officer Tesreau decided to place the defendant in handcuffs and to seat him in the back seat of the police car pending Officer Tesreau's further investigation. Officer Tesreau explained to Carter that he was being detained pending further investigation. During an investigative detention

of a person police officers may take such steps as are reasonably necessary to protect their safety and to maintain the status quo during the course of the stop. United States v. Hensley, 469 U.S. 221, 235 (1985). Here, Officer Tesreau had discovered evidence of drug trafficking activity in the defendant's vehicle. He was obviously concerned that a weapon might be in the vehicle as was evidenced by the fact that he drew his own weapon when the defendant refused the order to show his hands and made movements with his hands toward his right side. It was reasonable in such circumstances to place the defendant into handcuffs and into the police vehicle while Officer Tesreau continued his investigation. United States v. Navarette-Barron, 192 F.3d 786, 791 (8th Cir. 2003); United States v. Bell, 480 F.3d 860, 864 (8th Cir. 2007).

After placing the defendant in the police car Officer Tesreau ran a computer record check which showed that the defendant had convictions for violent offenses, Manslaughter and Assault First Degree, and that he was then on parole. Officer Tesreau also asked that other officers be on the lookout for the red Monte Carlo automobile and to stop it if it was located. He then again spoke with the defendant who continued in the assertion that the capsules found in the car did not belong to him.

Officer Tesreau then determined to place the defendant under arrest. This arrest was lawful, even though made without a warrant, because it was made upon probable cause that the defendant

was committing an offense.  United States v. Watson, 423 U.S. 411 (1976).  §195.233.1, R.S.Mo. provides that it is unlawful to possess with intent to use any paraphernalia that may be used to pack, store or contain any controlled substance.  The number of gelatin capsules found, the manner in which they were packaged, as well as Officer Tesreau's training and experience as to the fact that such capsules were used for such purposes all combined to give the officer probable cause to arrest the defendant.

After placing the defendant under arrest Officer Tesreau directed Officer Dorsey to search the vehicle.  Officer Dorsey did so and found a loaded handgun wedged between the driver's seat and the console of the vehicle.  Officer Dorsey then seized the weapon. The search of the vehicle was lawful.  When police officers lawfully arrest the occupant of a vehicle they may search the passenger compartment of the vehicle. New York v. Belton, 453 U.S. 454 (1981); United States v. Orozco-Castillo, 404 F.3d 1101, 1103 (8th Cir. 2005).  This is true even if the occupant has been removed and is no longer in the vehicle.  Id.

After the defendant was arrested he was transported to the police station. During the booking process Officer Shelton was conducting a search of the defendant's person and the clothing he was wearing.  As he did so the defendant, on two separate occasions, dropped from his person plastic bags which contained gelatin capsules identical to those found in the defendant's

vehicle. Officer Shelton recovered and seized those bags and capsules. The capsules were found to contain heroin. A quantity of currency was also found on the defendant's person. The search of the defendant at the police station was lawful. When police officers lawfully arrest an individual they may conduct a complete search of that person for weapons and evidence. United States v. Robinson, 414 U.S. 218 (1973). "It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards, 415 U.S. 800, 803 (1974); United States v. Phillips, 607 F.2d 808, 809-10 (8th Cir. 1979). Moreover, when the defendant dropped the items from his hand as he was being searched, he abandoned the items and they were lawfully seized by the officer. United States v. Kelly, 329 F.3d 624, 629 (8th Cir. 2003).

## Conclusion

For all of the foregoing reasons the defendant's Motion to Suppress Physical Evidence should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Physical Evidence (Docket No. 33) be denied.

The parties are advised that they have until **February 4, 2008,** in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

*Frederick R. Buckles*
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of January, 2008.